**Thomas F. SMITH, Jr., et al.**

v.

**CUMBERLAND SCHOOL COMMITTEE et al.**

**No. 79–22–Appeal.**

Supreme Court of Rhode Island.

June 3, 1980.

---

Oster, Groff & Prescott, George M. Prescott, Lincoln, S. Arlene Violet, Consultant Atty., R.I. Protection & Advocacy System, Inc., Providence, for amicus curiae.

James M. Shannahan, Marcia L. McGair, Providence, for Cumberland School Committee.

Dennis J. Roberts, II, Atty. Gen., Forrest Avila, Sp. Asst. Atty. Gen., for defendants.

## OPINION

DORIS, Justice.

The United States District Court for the District of Rhode Island has certified to this court two questions of law that require us to decide whether a school committee or the Department of Mental Health, Retardation and Hospitals (MHRH) must bear the cost of providing special education for handicapped children.

The facts underlying this litigation are not in dispute. Thomas Smith, a twelve-year-old multihandicapped child, and his parents reside in Cumberland, Rhode Island. Due to Thomas's physical and emotional handicaps, the regular programs offered in the Cumberland school system do not meet his particular educational needs. Since December 1975, therefore, Thomas has been enrolled in the Day Hospital Program at Bradley Hospital, which, the parties agree, provides him with an appropriate education. The Cumberland School Committee (school committee) partially funded the tuition for this program for approximately one year following Thomas's enrollment.[1] In November 1976, however, the superintendent of schools informed plaintiffs that MHRH, not the school committee, was responsible for providing Thomas's special education. The school committee unanimously upheld the superintendent, concluding that G.L. 1956 (1977 Reenactment) §§ 40.1–7–1 to –9 dictated that the education and care of Thomas were the responsibility of MHRH. The plaintiffs appealed the decision of the school committee to the associate commissioner of education, who held that MHRH must provide the special education and related services and that the school committee must contribute to MHRH only the "per pupil cost" as its share of the services provided to Thomas.

The plaintiffs petitioned the Family Court for an order that the school committee continue to finance Thomas's special education. The Family Court dismissed the action for want of jurisdiction. The plaintiffs then commenced a civil action in Superior Court seeking the same relief. The court dismissed this action on the ground that plaintiffs had not exhausted their administrative remedies. The plaintiffs then filed a third action in the United States District Court for the District of Rhode Island seeking a mandatory injunction ordering the school committee to continue

funding Thomas's special education. The District Court found that G.L. 1956 (1969 Reenactment) § 16–24–1, which requires local school committees to provide a special education for handicapped children, and G.L. 1956 (1977 Reenactment) §§ 40.1–7–1 to –9, which establish within MHRH a program for emotionally disturbed children, both dealt with educating handicapped children. Because of the apparent statutory conflict, the District Court chose to abstain from deciding the case in order that this court might be allowed an opportunity to construe the statutes.[2] Accordingly, the District Court certified to this court pursuant to Sup.Ct. Rule 6 the following two questions:

"1. If the educational programs organized and/or managed by a local school committee fail to provide adequate special education for a resident handicapped child, do the applicable regulations promulgated pursuant to R.I.G.L. S. 16–24–1, 16–24–2 require the school committee to provide free education in another 'special education program approved by the Commissioner of Education'?

"2. If so, are those 'other special education programs' that are approved by the Commissioner of Education pursuant to S. 16–24–1 'special educational programs under the jurisdiction of the board of regents for education' as defined in R.I.G.L. S. 40.1–7–7?"

We note at the outset that the statutes serve different purposes: § 16–24–1 is by its terms educational in nature, while §§ 40.1–7–1 to –9 have a primarily therapeutic purpose, though they include a provision for educational services. Pursuant to § 16–24–1, a school committee has an affirmative obligation to provide the type of special education that will best satisfy the needs of a resident handicapped child whose mental retardation or physical or emotional handicap prevent his normal educational

---

1. The annual tuition for this program is $18,-000.

2. Prior to this decision, the United States District Court had ordered the school committee to continue funding Thomas's education at Bradley Hospital until his appeal was concluded.

growth and development.[3] Though the predecessor to this statute was enacted in 1952, § 16–24–1 must be viewed in the context of the Education for All Handicapped Children Act of 1975 (the Act), 20 U.S.C.A. §§ 1401–1461 (West 1978). The Act is a funding vehicle through which the federal government channels money to the states to provide full educational opportunities to handicapped children. *Loughran v. Flanders*, 470 F.Supp. 110, 113 (D.Conn. 1979). To be eligible for these federal funds, a state must comply with a number of conditions, such as establishing a policy that assures all handicapped children of a right to a free appropriate public education, developing a plan to implement the policy of providing a full educational opportunity to all handicapped children, and establishing certain procedural safeguards to protect the rights of handicapped children.[4] Addi-

tionally, the local educational agency[5] in each state must establish and annually revise an individualized education program[6] for each handicapped child.

The Board of Regents for Education must comply with the federal requirements because the state receives federal funds under the Act. It is evident from the regulations adopted by the board of regents pursuant to § 16–24–2 that the regents have attempted to conform to the Act by making our existing educational system for handicapped children provide special educational services in the manner envisioned by the Act. Under the Act, it is the responsibility of the local educational agency to administer the special education programs. Consistent with this requirement, the regulations adopted by the board of regents require the school committees to provide a free special education for handicapped chil-

---

**3.** *General Laws 1956 (1969 Reenactment)* § 16–24–1 provides:

"Duty of school committee to provide special education.—In any city or town where there is a child within the age range as designated by the regulations of the state board of education, who is either mentally retarded or physically or emotionally handicapped to such an extent that normal educational growth and development is prevented, the school committee of such city or town shall provide such type of special education that will best satisfy the needs of the handicapped child, as recommended and approved by the state board of education in accordance with its regulations."

**4.** 20 U.S.C.A. § 1412(1), (2), (5) (West 1978). A "'free appropriate public education'" is defined as:

"special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." 20 U.S.C.A. § 1401(18) (West 1978).

**5.** A "'local educational agency'" is:

"a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other

political subdivision of a State, or such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools. Such term also includes any other public institution or agency having administrative control and direction of a public elementary or secondary school." 20 U.S.C.A. § 1401(8) (West 1978).

**6.** An "'individualized education program'" is defined as:

"a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." 20 U.S.C.A. § 1401(19) (West 1978).

dren either through their own programs or through other private special education programs approved by the Commissioner of Education.[7]  In the event that the established local educational programs fail to provide an adequate special education for a handicapped child, the regulations of the board of regents would thus require the school committee to "provide for the free education * * * through * * * other special education programs approved by the Commissioner of Education."

The statutory program created within MHRH by G.L. 1956 (1977 Reenactment) §§ 40.1–7–1 to –9 to provide services for emotionally disturbed children relieves the school committee of its obligation to educate handicapped children only in certain limited circumstances.  As we stated earlier, this program has a primarily therapeutic purpose of providing "psychiatric care and treatment" to emotionally disturbed children.  The educational services to which a child might be entitled as part of his "care and treatment" are thus incidental to the medical and psychiatric services he receives.  We believe that the Legislature incorporated a provision for educational services into the definition of "care and treatment" to ensure that an emotionally disturbed child would continue to receive educational services while being treated in the MHRH program.  We have previously held that MHRH has only a contingent obligation to provide educational services to handicapped children.  The child must first be "emotionally disturbed," which requires that he "be in need of psychiatric care and treatment."  G.L. 1956 (1977 Reenactment) § 40.1–7–4(5).  If the child is not in need of such treatment, he is not "emotionally disturbed" and is not eligible for the MHRH program.  See Naughton v. Goodman, 117 R.I. 113, 117–18, 363 A.2d 1345, 1348 (1976).  Secondly, even if a child is eligible for the program, he is not thereby guaranteed treatment.  The availability of all benefits under the program is limited by the funding the program has received.  When the appropriated funds are exhausted, MHRH need not provide any "care and treatment" or educational services, regardless of a child's eligibility or need for them.  Roe v. Affleck, R.I., 390 A.2d 361, 368 (1978).  In such a situation the director of MHRH fulfills his responsibility to the eligible handicapped children by placing their names on a waiting list until such time as there are sufficient funds to pay for their care and treatment.  See In re Doe, R.I., 390 A.2d 390, 395–96 (1978).

Once an emotionally disturbed child is admitted to the MHRH program, the educational services available as part of the "care and treatment" are further limited by statute in that "care and treatment" includes only "those educational services furnished to a child other than those regular or special education programs under the jurisdiction of the board of regents for education."  G.L. 1956 (1977 Reenactment) § 40.1–7–4(1) (Emphasis added).  The emphasized language—the exclusionary phrase—quite clearly excludes from the definition of care and treatment those educational services that are under the jurisdiction of the regents.  We believe that the exclusionary phrase was intended to prevent MHRH from duplicating the educational services that are provided through programs under the jurisdiction of the regents.  The statute, however, does not define "the jurisdiction of the board of regents."  In order to conform with the therapeutic purpose of §§ 40.1–7–1 to –9, we believe that we must construe the jurisdiction of the regents to include those private special education programs which, at public expense, provide the educational services that a school committee, though obliged to provide, is unable to offer because it lacks

---

7.  Regulations of the board of regents governing the Special Education of Handicapped Children § 1, Art. III(1).  The regulation provides:

"Responsibility—The school committee of each school district shall establish within its school district the special education required by these regulations and/or it shall provide for the free education of all resident handicapped children either through these programs or in other special education programs approved by the Commissioner of Education."

the requisite facilities or expertise to accommodate the unique needs of a handicapped child. To rule otherwise could require MHRH to devote a substantial portion of its resources to providing special education services, which would effectively frustrate the therapeutic purpose of the program by decreasing the funds available for providing psychiatric services. Accordingly MHRH is not in the first instance obliged to finance a handicapped child's special education in a private program; that obligation belongs solely to the school committees. What obligation MHRH has to provide educational services is very limited and it complements rather than supplants the obligation of the school committees under § 16–24–1.

The obligation of MHRH to provide special education services arises when the services that the school committee must provide are no longer accessible to an emotionally disturbed child as a consequence of the "psychiatric care and treatment" he is receiving in the MHRH program. We wish to emphasize that a municipality may not render special education programs "inaccessible"—thus shifting the responsibility to MHRH—simply by choosing not to create or to finance them. On the contrary, a school committee must either establish its own programs or provide for a child's special education in a private program. The determinative factor is whether a child's placement and treatment in the MHRH program would deprive him of his access to the existing public or private special education programs or would cause him to be absent from those programs to such an extent that his educational growth and development would be impaired. If either situation occurs, then MHRH must assume the responsibility of educating the child, and this responsibility continues until such time as the child either leaves the MHRH program or is able to resume his education in the program existing under the jurisdiction of the regents.

This construction of § 40.1–7–4(1) ensures that an emotionally disturbed child who no longer has access to either a regular or special education program because of his "psychiatric care and treatment" in the MHRH program will nonetheless not be deprived of his educational opportunities while being treated. The obligation of MHRH to provide special education services is thus very limited. Contrary to the opinion of the associate commissioner, §§ 40.1–7–1 to –9 do not impose on MHRH the responsibility of educating all emotionally handicapped children, nor do they relieve a school committee of its responsibility under § 16–24–1 as the primary provider of special educational services.

It is our opinion, therefore, that the answer to the first question must be in the affirmative.

Another exclusionary phrase nearly identical to the one in the definition of "care and treatment" appears in § 40.1–7–7, which deals with the contributions that each community must make to MHRH as the community's share of the cost of educational services provided by MHRH to emotionally disturbed children. Prior to July 1, 1979, § 40.1–7–7 had provided:

"Each community * * * shall contribute to the department, [MHRH] * * its average per pupil cost for education * * * as its share of the cost of the educational services furnished to emotionally disturbed children *in programs other than those regular class or special education programs under the jurisdiction of the board of regents for education.*" (Emphasis added).

The second certified question asks us to determine whether "other special education programs," such as the one at Bradley Hospital, are "special education programs under the jurisdiction of the board of regents," as defined in § 40.1–7–7. In light of our prior construction of "jurisdiction" in § 40.1–7–4(1), it would seem that we should again construe the term to include these programs. Since the District Court has certified the questions to us, however, the Legislature has amended § 40.1–7–7. The statute now reads:

"Each community * * * shall contribute to the department, * * * its average per pupil cost for special education * * * as its share of the cost of the educational services furnished to emotionally disturbed children *in programs other than those regular class or special education programs under the control and management of the school committee.*" G.L. 1956 (1977 Reenactment) § 40.1-7-7, as amended by P.L. 1976, ch. 130, § 4. (Emphasis added).

Because the statute has been amended, what we must now determine is whether the "other special education programs" referred to in the question are "special education programs under the control and management of the school committee." We believe that they are.

It is our opinion that a construction of "control and management" that includes both those programs administered directly by the school committee as well as those private programs in which the committee has placed handicapped children is the only construction of the exclusionary phrase that comports with the purpose of § 40.1-7-7. The language of § 40.1-7-7 indicates that the statute has a compensatory purpose. As we stated in answering the first question, the obligation of MHRH to educate a handicapped child arises only after the child has been admitted to the MHRH program and no longer has access to the programs provided by the school committee. To the extent that MHRH then provides educational services for handicapped children, a need for compensation exists because of these occasions MHRH must bear the costs of education that otherwise would have been borne by the school committee, pursuant to G.L. 1956 (1969 Reenactment) §§ 16-24-1 and 16-24-2. Recognizing that there is no need for a community to reimburse MHRH for educational services that the community already provides, the Legislature incorporated into § 40.1-7-7 an exclusionary phrase which relieves a community of its duty to contribute to MHRH for those educational services offered in programs "under the control and management of * * * [its] school committee." In

light of the compensatory nature of the statute, it makes little sense to us to construe "control and management" in such a manner that we would distinguish between special education programs administered directly by the school committee and private special education programs in which the school committee has placed resident handicapped children whose special needs have not been met by the committee's existing programs. From a financial standpoint there is little to differentiate the two types of programs. The school committee must bear the cost of providing a special education regardless of the nature of the program in which the child receives it. In addition, the school committee retains a significant degree of control over the content of the educational services provided in a private program because the regents' regulations and the Act require that a representative of the committee participate in the formulation of the child's individualized education program.

The central issue in determining whether § 40.1-7-7 applies is whether a community, through its school committee, has paid for the educational services that have been provided to a handicapped child. If it has, then the exclusionary phrase relieves it of its obligation to contribute to MHRH. If the child has received the necessary educational services from the MHRH program, then the exclusionary phrase does not apply and the community must contribute its average-per-pupil cost for special education to MHRH.

We believe that the Legislature amended the exclusionary phrase in § 40.1-7-7 in order to make the statute more precise, not to diminish its scope. An examination of the Act in which the Legislature amended § 40.1-7-7 shows that the Legislature contemporaneously extended the applicability of the regents' regulations to the educational services offered by MHRH. Public Laws 1976, ch. 130, § 6 (amending G.L. 1956 (1969 Reenactment) § 16-24-2). The replacement of the phrase "jurisdiction of the board of regents" with a more precise phrase was necessary to avoid a construc-

tion of the statute that would place MHRH under the jurisdiction of the regents for purposes of § 40.1–7–7 simply because its educational program was subject to the regents' regulations. Such a construction of the statute would have brought the MHRH program within the ambit of the exclusionary phrase, resulting in a situation in which the contributions to MHRH, if any, would not reflect the costs incurred by MHRH in providing special educational services to emotionally disturbed children. We will not ascribe such an improbable intent to the Legislature. *Berthiaume v. School Committee of Woonsocket*, R.I., 397 A.2d 889, 892 (1979). It is our opinion that the Legislature amended § 40.1–7–7 with the intention of clarifying the somewhat opaque language of the exclusionary phrase. We perceive nothing in the amending act that indicates an intent to affect the obligation of communities to reimburse MHRH for a portion of the costs incurred by that department in providing educational services to emotionally disturbed children. For these reasons, the answer to the second certified question must also be in the affirmative.